UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD CLARK,

        Petitioner,                                    Hon. Gordon J. Quist

v.                                                  Case No. 1:14-CV-80

CATHLEEN STODDARD,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Clark's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Clark's petition be **denied**.


## BACKGROUND

As a result of events allegedly occurring between July 1, 2006, and April 29, 2007, Petitioner was charged with: (a) one count of first degree criminal sexual conduct; (2) two counts of second degree criminal sexual conduct; (3) three counts of third degree criminal sexual conduct; (4) three counts of fourth degree criminal sexual conduct; and (5) four counts of accosting, enticing, or soliciting a minor for immoral purposes. (PageID.391-94). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**James Henry**

Henry testified that he presently served as the Director of the Children's Trauma Assessment Center at Western Michigan University. (PageID.504). Henry was permitted to testify as an expert in the area of child sexual abuse and trauma. (PageID.507-08).

Henry indicated that "delayed reporting or delayed disclosure is something that's very common in child sexual abuse." (PageID.508). There are "a variety of reasons why children delay their disclosure" of sexual abuse including fear and shame. (PageID.509-10). Adolescents "most often" disclose abuse to a friend or peer. (PageID.510-11). Henry further noted that where somebody suffers "multiple sexual abuses, they blur together, so that distinguishing what happened on which day" becomes "difficult." (PageID.511-12).

Henry described many of the behaviors in which child or adolescent victims of sexual abuse often engage. (PageID.513-14). Some victims become "hyper-sexualized" whereas others, especially girls, become withdrawn or depressed. (PageID.513). Some victims engage in cutting, "not as an attempt at suicide, but an attempt to feel, because what we know of kids who have been sexually abused, again, chronically, is they kind of become numb, they can't feel, and so cutting is a way to feel." (PageID.514). Victims often become rebellious or defiant. (PageID.514). With respect to the issue of "grooming," the following exchange occurred between the prosecutor and Dr. Henry:

> Q:    Dr. Henry, can you explain what grooming is?
>
> A:    Grooming is what an offender would do to a child to be able to gain a response to them to get them to trust them. Grooming would be an offering of a gift. Grooming would be I'm going to do something very special with you, I'm going to give something that is only for you, which makes the child feel very special.

And so that's the beginning, and that's that grooming, and then slowly that becomes blurred into touching, all right, like look what I've done for you, the child feels indebted to the, quote, offender because of all the nice things he or she has done for them.  And so especially with children who have been taught to respond to adults, when adults do nice things for them, they are to reciprocate.  And so when you think of grooming in this way, this exceptional gift, or this kindness and this building of trust that he wouldn't hurt me, but all along that plan is to offend that child later on, it really sets the child up as extremely vulnerable and committed to letting what happens happen because of what the offender has given, or the specialness that she has been made to feel.

Q:     And what factor do[] animals kind of play in this grooming process?

A:     Animals can play a variety of ways into this.  With children, animals are usually very special.  Not all children animals are special, but, you know, this idea of, you know, I'll give you an animal, a kitten, I'll give you special privileges in terms of my farm, or you can be with the animals.  Horses are one of those things that normally attracts children.  All we have to do is think about the multiple films that are all horses with kids, and they really do attract children in a very positive, nurturing kind of way.   And so this is something that kids usually don't have available, and when specifically like with horses, here, look what you can do, it really gives them a sense of privilege and a sense of specialness that can certainly be used as grooming.

(PageID.514-16).

3

**H.O.**

H.O. met Petitioner after completing the eighth grade. (PageID.522-23). Petitioner lived approximately one mile from H.O.'s residence. (PageID.523-24). Petitioner owned horses and trained H.O.'s younger sister, A.C., and several of H.O.'s friends to ride. (PageID.524-25). Petitioner conducted much of this training in a bedroom of a house he was rebuilding. (PageID.525-26). Petitioner furnished this room with a barrel, on which a saddle was placed, as well as a cot and a desk. (PageID.525). Petitioner provided H.O. with drugs and alcohol and sexually assaulted her on several occasions. (PageID.526-37, 539-41). This activity began in December 2006 and continued through April 2007. (PageID.526-29). As a result of Petitioner's assaults, H.O. became depressed and began acting out and skipping school. (PageID.534-35). H.O. also began cutting herself. (PageID.536). H.O. eventually revealed to her school counselor, Jason Luke, what Petitioner had done to her. (PageID.534-38).

**A.C.**

A.C. first encountered Petitioner as she was walking by Petitioner's property one day. (PageID.550-51). A.C. was twelve years old at the time. (PageID.550-51). Petitioner was outside feeding his horses and invited A.C. and her friend to "come by" and pet the horses. (PageID.551). A.C. soon began going to Petitioner's residence every morning to help feed the horses. (PageID.552). H.O. later began accompanying A.C. to Petitioner's residence. (PageID.552-53). Petitioner purported to train A.C. to ride a horse by using the barrel located in the bedroom. (PageID.554). When A.C. was sitting on the barrel, Petitioner would place his hand inside A.C.'s pants, "down in [her] private area," and instruct A.C. to "lean forwards into his finger."

(PageID.554-57).  Petitioner claimed this activity was for "breathing and posture."  (PageID.555-56).  During these training sessions, Petitioner would also touch A.C.'s breasts.  (PageID.555-56).

**J.H.**

J.H. met Petitioner in the spring of 2007 when she was 14 years of age.  (PageID.564-66).  J.H. told Petitioner she "wanted to ride horses."  (PageID.566-67).  Petitioner responded that she would first have to "go through training, which was on a barrel in the back part of the house."  (PageID.567).  Petitioner instructed J.H. to get on the barrel and "rock back and forth."  (PageID.567).  Petitioner then began to touch and rub J.H.'s "crotch."  (PageID.567-68).  J.H. asked Petitioner to stop at which point Petitioner "backed off a little bit," but then began to touch J.H.'s breasts instead.  (PageID.568-69).  J.H. again told Petitioner to stop.  (PageID.568-69).  Petitioner responded by telling J.H. that what he was doing was "normal" and that "if you go to another personal trainer, they'll do the same thing."  (PageID.569).  Petitioner also instructed J.H. that "what happens in this room stays in this room."  (PageID.568).

**D.B.**

D.B. met Petitioner in the summer of 2006 when she was 12 years of age.  (PageID.575-76, 582).  When D.B. indicated that she liked horses, Petitioner told her that she "can come out and ride them sometimes."  (PageID.578).  Petitioner told D.B. that he would not charge her for horse training because she was "special."  (PageID.578).  Petitioner conducted horse training using a barrel located in a "house that he was building."  (PageID.579).  While purporting to train

5

D.B., Petitioner "put his hand up in [her] shirt."  (PageID.580-81).  Petitioner also placed his hand in D.B.'s pants and instructed her to "lift [her] leg up" so that he could "make sure that the muscle was strong."  (PageID.581-82).  Petitioner told D.B. that if she "got good enough at riding horses" she would be able to "compete and everything" and that if she won, she "would get a horse." (PageID.582-83).

**J.N.**

J.N. met Petitioner in April 2007 when she was 15 years old.  (PageID.588-89).  J.N. went to Petitioner's residence with her boyfriend and H.O.  (PageID.589).  Petitioner asked J.N. if she "wanted to learn how to ride horses."  (PageID.590).  J.N. responded, "I don't know, sure." (PageID.590-91).  Petitioner led J.N. into the portion of his house where the training barrel was located and instructed J.N. to "go on the saddle."  (PageID.591).  Petitioner told J.N. to practice her breathing and pretend she was on a real horse.  (PageID.591).  Petitioner then began to rub J.N.'s shoulders.  (PageID.591).  Petitioner then sat on the barrel behind J.N. and began massaging her breasts.  (PageID.592).  Petitioner later began touching J.N.'s inner thigh.  (PageID.592-93).  J.N.'s boyfriend eventually entered the room and shortly thereafter J.N. went outside.  (PageID.593-94).

**M.K.**

M.K. met Petitioner in April 2007 when she was 13 years old.  (PageID.614).  M.K. accompanied H.O. to Petitioner's residence on three occasions.  (PageID.616).  On the third occasion, Petitioner was discussing horse training with H.O. and M.K.  (PageID.616).  At some point, H.O. left the room to answer her phone.  (PageID.616).  After H.O. exited, Petitioner

6

instructed M.K. to get on the training barrel.  (PageID.616-17).  As Petitioner was explaining "breathing techniques," he placed his hands on M.K.'s stomach.  (PageID.617).  Petitioner then touched M.K.'s breasts and attempted to put his hands on M.K.'s legs.  (PageID.617-18).  M.K. "stopped" Petitioner from touching her further and exited the room.  (PageID.618).  She located H.O. and the pair immediately departed Petitioner's property.  (PageID.618).

**Bruce Morse**

As of April 30, 2007, Morse was employed as a Sergeant with the St. Joseph County Sheriff's Department.  (PageID.626-27).  On this date, Morse learned that Jason Luke, with the Vicksburg School District, had contacted the Sheriff's Office "to report a criminal sexual conduct type of case."  (PageID.627).  Morse contacted Luke who reported that "he had information of some girls that had been sexually assaulted."  (PageID.627).

After speaking with Luke, Sergeant Morse spoke with H.O.  (PageID.627-28).  Claire Nehring, a sexual assault counselor with the YWCA, was present during this interview.  (PageID.628).  H.O. reported that Petitioner had sexually assaulted her on multiple occasions.  (PageID.628-29).  Morse also spoke with A.C. who likewise reported that Petitioner had sexually assaulted her.  (PageID.633).  Morse was subsequently contacted by Pam Garrett, a middle school counselor with the Vicksburg School District.  (PageID.629-30).  Garrett provided Morse with the names of additional sexual assault victims.  (PageID.630).  Morse later spoke with D.B. who reported that she had been sexually assaulted by Petitioner.  (PageID.633-34).  Morse did not speak with J.H. and J.N. who were interviewed by different law enforcement officers.  (PageID.634-35).

**Lonnie Palmer**

As of May 10, 2007, Palmer was employed as a Detective with the St. Joseph County Sheriff's Department.  (PageID.654-55).  On this date, Palmer spoke separately with J.N. and M.K. both of whom reported being sexually assaulted by Petitioner.  (PageID.655-56).  On May 14, 2007, Palmer spoke with J.H. who also reported being sexually assaulted by Petitioner.  (PageID.656-57).

**Pam Garrett**

Garrett was the Guidance Counselor at Vicksburg Middle School.  (PageID.670). She was approached by A.C. and M.K. both of whom reported being the victims of sexual assault. (PageID.670-71).  Garrett immediately contacted the police as well as Jason Luke, the high school counselor.  (PageID.671-74).

**Phyllis Van Order**

As of May 2, 2007, Van Order was employed as a sexual assault nurse examiner with the Kalamazoo YWCA.  (PageID.676-78).  On this date, Van Order met with H.O. and conducted a "a comprehensive head to toe examination. . .both physical and emotional." (PageID.678).  During this examination, H.O. reported that she had been sexually assaulted by Petitioner.  (PageID.680).

Following the presentation of evidence, the jury found Petitioner guilty of: (a) one count of second degree criminal sexual conduct; (b) four counts of third degree criminal sexual conduct; (c) two counts of fourth degree criminal sexual conduct; and (d) one count of accosting, enticing, or soliciting a minor for immoral purposes.  (PageID.779).  Petitioner was sentenced to serve prison sentences of varying lengths ranging from 25-48 months to 195-360 months.

(PageID.796-98).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.    The trial court abused its discretion in ruling the prosecution had shown due diligence in attempting to subpoena, locate and produce Claire Nehring, thus denying Mr. Clark his state and federal constitutional right to confrontation.
>
> II.   Defense trial counsel was constitutionally ineffective in failing to object to inadmissible and unfairly prejudicial evidence of appellant's alleged prior police contact, or move for a mistrial.

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence. *People v. Clark*, 2010 WL 673355 (Mich. Ct. App., Feb. 25, 2010).  Asserting the same two issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal.  *People v. Clark*, Case No. 140917, Order (Mich., July 26, 2010).

Petitioner subsequently moved in the trial court for relief from judgment asserting the following issues:

> I.    Trial counsel made blunder upon blunder and mistake after mistake and proved to all involved, especially the defendant, that he did not provide constitutionally effective representation as guaranteed by the Sixth Amendment to the U.S. Constitution and recognized by the United States Supreme Court in *Strickland v. Washington*.
>
> II.   Defendant is entitled to relief from judgment where there is good cause for not raising the issues previously, the issues involve the denial of constitutional rights, defendant was prejudiced, and manifest injustice has resulted as in the case at hand.
>
> III.  Substantial prosecutorial misconduct deprived Mr. Clark of a fair trial, where the prosecutor: (1) failed to disclose negative DNA tests or the fact that DNA

9

swabs were not done; (2) badgered the jury to find the defendant guilty until the judge ordered her to stop and desist, infringing on the jury's role as the trier of fact; (3) conspiring with the defense attorney to hide or withhold lab reports from the jury; and (4) conspiring with defense attorney to withhold vital evidence from jury foreman who requested such evidence.

IV.     Additional issues of ineffective assistance of trial counsel contrary to the Sixth Amendment to the U.S. Constitution, recognized by the United States Supreme Court in *Strickalnd v. Washington*.

V.      Ineffective assistance of appellate counsel contrary to the Sixth Amendment to the U.S. Constitution, recognized by the United States Supreme Court in *Strickalnd v. Washington*.

The trial court denied Petitioner's motion for relief from judgment. *People v. Clark*, File No. 08-14903-FC, Opinion and Order (St. Joseph Cnty. Cir. Ct., Nov. 16, 2011). Petitioner appealed this decision to the Michigan Court of Appeals which denied relief on the ground that Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Clark*, Case No. 309930, Order (Mich. Ct. App., Aug. 23, 2013). The Michigan Supreme Court later denied Petitioner relief on the same ground. *People v. Clark*, Case No. 147732, Order (Mich., Nov. 25, 2013). Petitioner initiated the present action on January 23, 2014, asserting the following claims:

I.      Tainted jury.

II.     Confrontation denied by missing witness Ms. Claire Nehring that the State knew 2-weeks before trial.

III.    Prosecutorial misconduct tainting jury.

IV.     Judicial abuse of discretion/interference.

10

V.      Ineffective assistance of trial counsel.

VI.     Ineffective assistance of appellate counsel.

## STANDARD OF REVIEW

Clark's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301,

307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the

"factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be

13

overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

In her pleadings, Respondent argues, not unpersuasively, that Petitioner has failed to properly exhaust and/or procedurally defaulted many of the claims presented in this Court. Rather than struggle with these often difficult procedural issues, the undersigned opts to simply address the substance of Petitioner's claims as they so clearly lack merit. *See, e.g., Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) (recognizing that a habeas court need not address "complicated" procedural issues which are "unnecessary to the disposition of the case").

## I.        Fair and Impartial Jury

During the jury selection process, the following exchange occurred between the trial judge, Petitioner's counsel, and two potential jurors:

The Court:              Thank you.  Mr. Champion, do you have any questions?

Mr. Champion:          Thank you, your Honor.  Mr. Poortenga, good morning.  The judge has already instructed you folks the defense doesn't have to prove a thing.  Does that in any way offend you, that it's not my job to prove anything in this case and the

14

|                    | prosecutor has the burden of proving everything in this case? |
|--------------------|---------------------------------------------------------------|
| Juror Poortenga:   | No. |
| Mr. Champion:      | You understand we could have a different system, an accusatory system, which is what we have, or an inquisitory system, where a person has to prove they're not guilty, you wouldn't expect a person to have to prove they're not guilty; correct? |
| Juror Poortenga:   | The person themself?  No. |
| Mr. Champion:      | If you had to go back to the deliberation room right now and cast a verdict, what would that verdict be? |
| Juror Poortenga:   | I don't know. |
| Mr. Champion:      | Why don't you know? |
| Juror Poortenga:   | I don't know until I hear the story. |
| Mr. Champion:      | Right.  So if you had to go back to the deliberation room right now and the judge instructed you this is an innocent man, you could follow that instruction and find him not guilty; correct? |
| Juror Poortenga:   | Yes. |
| Mr. Champion:      | Would you all find the same way?  I see somebody, Mr. Havens, good morning. |
| Juror Havens:      | Yeah, I would.  I have difficulties with the sheer numbers of complaints.  If we're looking at one individual making an accusation, you need a lot more information.  Immediately, as it's presented right now is your question, with the number of complaints against the individual, I would have to - - I'm leaning with the gentleman being guilty. |
| Mr. Champion:      | Well, I appreciate you being so forthright about it.  Is there anybody else that shares that point of view? |
| The Court:         | Some say I do.  I instructed you the fact that there is more than one count is not evidence of anything, and the fact that there's more than two counts is not evidence of anything.  So that's why he's pointing this out.  What we're looking for is |

people saying no, wait a minute, I do, I'm having trouble with that instruction. So I appreciate your honesty on that, Mr. Havens. Can you set that feeling aside though? Can you follow the instruction that all of us, if accused by another, is presumed innocent, and that Mr. Clark has the presumption of innocence until the prosecutor has presented evidence which proves to you beyond a reasonable doubt that he is guilty of the charges made, or are you saying I can't do that in this case?

Juror Havens:    I'm saying that he's got a difficult job ahead of him. I would listen, obviously to all the information that's presented, and based on that make a decision, but I'm not going to sit here and tell you I don't have a strong opinion going in.

(PageID.434-37).

Petitioner asserts that the comments by Juror Havens deprived him of the right to a fair and impartial jury. Petitioner did not present this claim in state court, thus it will be assessed de novo as discussed above.

The Sixth Amendment provides that every criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. In addition to the safeguards articulated in the Sixth Amendment, the Constitution's due process protections likewise afford to criminal defendants the right to be tried by an impartial jury. *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). As is recognized, the voir dire process is designed to protect this right "by exposing possible biases, both known and unknown, on the part of potential jurors." *Mitchell*, 354 F.3d at 520 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

When the ability of a juror to serve impartially is at issue, "the relevant question is 'did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Mitchell*, 354

F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).  In the context of a petition for writ of habeas corpus, a trial court's assessment regarding a juror's ability to serve impartially is a factual finding "entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence."  *Mitchell*, 354 F.3d at 520.

Havens was excused from service by use of a peremptory challenge.  (PageID.451). Havens' comments were not so inflammatory or inappropriate as to give rise to any reasonable concern that such influenced any other juror.  Petitioner has failed to identify any portion of the record suggesting otherwise.  The jurors who served at Petitioner's trial asserted under oath that they would follow the Court's instructions.  *See, e.g., United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) ("[j]urors are presumed to follow instructions").  The jurors were also questioned at length by the Court and the attorneys to explore their ability to serve impartially and Petitioner has identified nothing in the record suggesting that the jurors who did serve at his trial were unable to do so impartially.  Accordingly, this argument is rejected.

## II.        Confrontation Clause

As noted above, Sergeant Bruce Morse testified that Claire Nehring, a sexual assault counselor with the YWCA, was present when he spoke with H.O.  On July 2, 2008, twelve days before the start of Petitioner's trial, the prosecutor brought to the trial court's attention that the State was unable to locate Nehring because she had moved out of state without leaving a forwarding address.  (PageID.340).  Following an evidentiary hearing at which the State detailed the efforts it had undertaken to locate Nehring and secure her presence at Petitioner's trial, the court concluded that the prosecution had exercised due diligence in attempting to locate Nehring and, therefore,

17

permitted the State to remove Nehring from its witness list.  (PageID.340-65).  Petitioner argues that the failure by the State to produce Nehring at trial violated his constitutional right to confront the witnesses against him.

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him."  *Crawford v. Washington*, 541 U.S. 36, 42 (2004).  This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony.  *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial).

Nehring did not testify at Petitioner's trial, nor did the prosecution attempt to introduce into evidence any out-of-court statement or testimony by Nehring.  Thus, the Confrontation Clause is simply not implicated by the failure by the prosecution to secure Nehring's appearance at trial.  *See Crawford*, 541 U.S. at 51 (recognizing that the Confrontation Clause "applies to 'witnesses' against the accused - in other words, those who 'bear testimony'").  Petitioner's Confrontation Clause claim was rejected by the Michigan Court of Appeals which observed:

> Furthermore, because the prosecutor did not introduce at trial any out of court statement by Nehring, the Confrontation Clause was not implicated, and no constitutional error, plain or otherwise, occurred at defendant's trial.

*People v. Clark*, 2010 WL 673355 at *2 n.1 (Mich. Ct. App., Feb. 25, 2010).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.

18

Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### III.          Prosecutorial Misconduct

Petitioner asserts that he is entitled to relief because the prosecutor engaged in various forms of misconduct.  Specifically, Petitioner alleges the following: (1) the prosecutor improperly badgered prospective jurors; (2) the prosecutor presented false testimony; and (3) the prosecutor referred to Petitioner as a "predator" in her closing argument.  Of these three claims, the only one Petitioner raised in state court was his claim that the prosecutor badgered potential jurors. Accordingly, this particular claim will be analyzed pursuant to the deferential AEDPA standard whereas the other two claims will be considered de novo.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor."  *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).  Thus, even if the challenged comments or actions were improper, habeas relief is available only where such were "so flagrant as to render the entire

trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment or action resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments or conduct mislead the jury or prejudiced the accused; (2) whether the comments or actions were extensive or isolated; (3) whether the comments or actions were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

A.      Badgering Prospective Jurors

At one juncture in the jury selection process, the trial judge made the following comment to the prosecuting attorney:

> The other thing, too, is don't keep asking the questions if you haven't met the burden, will you find them not guilty, if you met the burden, will you. You're asking for a commitment from them. They understand their duties and I've already asked them can you abide by that instruction, so don't put them on - obviously, they'll say what you want them to say, they need to hear the evidence.

(PageID.462).

Petitioner asserts that this comment by the trial judge is evidence that the prosecutor had "badgered the perspective (sic) jurors by pounding them with statements to convict until the judge told her to stop." (PageID.29). A review of the record, however, reveals a much different

picture.

At the outset of the jury selection process, the trial judge made the following

comments:

> The defendant has pled not guilty to these charges and you should
> clearly understand that the Information I have just read is not
> evidence.  An Information is read in every criminal trial so that the
> defendant and the jury can hear the charges.  You must not think it is
> evidence of his guilt or that he must be guilty because he has been
> charged.
>
> A person accused of a crime is presumed to be innocent.  This means
> that you must start with the presumption that the defendant is
> innocent.  This presumption continues throughout the trial and
> entitles the defendant to a verdict of not guilty, unless you are
> satisfied beyond a reasonable doubt that he is guilty.
>
> Every crime is made up of parts called elements.  The prosecutor
> must prove each element of the crime beyond a reasonable doubt.
> The defendant is not required to prove his innocence or to do
> anything.  If you find that the prosecutor has not proven every
> element beyond a reasonable doubt, then you must find the defendant
> not guilty.  A reasonable doubt is a fair, honest doubt on the evidence
> or lack of evidence.  It is not merely an imaginary or possible doubt,
> but it's a doubt based on reason and common sense.  A reasonable
> doubt is just that, a doubt that is reasonable after a careful and
> considered examination of the facts and circumstances of this case.

(PageID.394-95).

Several minutes later, the trial judge revisited this particular issue, making the

following observation:

> Still on the issue of bias, or advocacy groups, anybody else have an
> issue as far as that?  No.  All right. Do all of you understand the
> basics, the last instruction that I read, or the last introductory
> statement regarding burden of proof?  Do all of you understand the
> prosecutor has the burden of proof?  The prosecutor must prove each
> charge, and each charge is made up of subparts and they're called
> elements, and the prosecutor's responsibility is to prove each element
> of each crime to your satisfaction beyond a reasonable doubt.  Do

21

you understand that that's the standard you will use as jurors? Everyone is indicating they do.

You understand that reasonable doubt is that, it's a doubt that is reasonable, it's based on reason and common sense after you've heard the evidence, and it's either based on the evidence or lack of evidence, but that's what the doubt, that's what the standard of proof is, beyond a reasonable doubt, and it's a doubt that's reasonable. Can all of you abide by that?

Now it's the prosecution's, the state's responsibility to prove the case. Do you all understand the defense has no obligation to prove anything to you? That the defendant is presumed innocent, and that presumption continues throughout the trial until you make a finding that the prosecution has proved the elements beyond a reasonable doubt? Do you understand that? Can all of you do that? You all are indicating you can.

(PageID.419-20).

A moment later, the prosecuting attorney asked the following question of the

prospective jurors:

Now the judge has already instructed you that our burden is to prove the elements of the case beyond a reasonable doubt, but is there any reason if I do prove the case and the elements beyond a reasonable doubt that you could not find the defendant guilty? Is there anybody who has a problem with that knowing I've met my burden but still could not find guilt?

(PageID.421).

Shortly thereafter, Petitioner's counsel posed to prospective jurors several related

questions regarding the prosecution's duty to prove Petitioner guilty beyond a reasonable doubt.

(PageID.434-40). A few moments later the trial judge, yet again, instructed the jury:

If you are satisfied the prosecutor has proven each element beyond a reasonable doubt, you must find the defendant guilty. If you find that they have not proven every element beyond a reasonable doubt, you must find the defendant not guilty. Do you understand that's your job as jurors?

22

(PageID.448).

   A few moments later, the prosecutor asked a prospective juror, "[a]nd with regard to this particular case, if I prove my case beyond a reasonable doubt, is there any reason that you could not find the defendant guilty?" (PageID.457). Almost immediately thereafter, Petitioner's counsel asked the following of a prospective juror:

> The prosecutor is making it clear this is strictly a testimonial case, void of any corroborating evidence. That being the case, if the prosecutor fails to prove that these alleged victims are telling the truth, what will your verdict be?

(PageID.458).

   A few moments later, the trial judge made to the prosecutor the statement, quoted above, that Petitioner asserts supports his claim. The Court is not persuaded. The prosecutor twice asked prospective jurors a straightforward question regarding her burden of proof. In so doing, the prosecutor did not misstate her burden, but instead was simply asking whether the jurors were able to follow the court's instructions on this particular item. It is clear from the transcript that both parties as well as the court considered it important to ensure that the jurors understood the concept of presumption of innocence and the prosecutor's burden of proof. This is understandable considering that the only evidence of Petitioner's crimes was the testimony of his victims. However, there exists a significant distinction between a prosecutor asking jurors if they understand the court's instructions and are able to follow such and badgering jurors as Petitioner alleges. While the trial judge apparently found the prosecutor's questions unnecessary, such does not make such questions improper or prejudicial.

   In sum, Petitioner has failed to establish that the prosecutor's comments were improper or deprived him of the right to a fair trial. The Court, therefore, concludes that the decision

23

by the state courts rejected this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Presenting False Testimony

As noted above, Sergeant Bruce Morse testified that when he spoke with H.O., Claire Nehring, a sexual assault counselor with the YWCA, was present.  (PageID.628).  Later in his testimony, Morse referred to Nehring as "a trained sexual assault counselor."  (PageID.631). Petitioner alleges that "the prosecutor had state witnesses testify to false statements regarding a missing witness: Ms. Claire Nehring.  And presented no documents substantiating whether this person was a trained counselor of any kind."  (PageID.29).

It is improper for a prosecuting attorney to knowingly present false testimony.  *See, e.g., Brooks v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010).  Petitioner, however, has presented no evidence that Nehring was *not* "a trained sexual assault counselor" or that the prosecutor knew or even should have known such was the case.  Simply put, Petitioner cannot demonstrate that referring to Nehring as "a trained sexual assault counselor" was inaccurate or otherwise improper. This argument is rejected.

C.      Referring to Petitioner as a Predator

In her closing argument, the prosecuting attorney referred to Petitioner as a predator. Specifically, the prosecutor stated, "[t]hink about who a predator would victimize."  (PageID.743).

Petitioner argues that such is improper and entitles him to relief. This argument is without merit. *See, e.g., Jackson v. Ludwick*, 2011 WL 4374281 at *11 (E.D. Mich., Sept. 20, 2011) (recognizing that on several occasions the Sixth Circuit has rejected claims that referring to a criminal defendant as a "predator" constituted prosecutorial misconduct or otherwise deprived a defendant of a fair trial). Accordingly, this argument is rejected.

IV.         **Judicial Abuse of Discretion**

Petitioner asserts that he is entitled to relief because the trial judge engaged in "interference" and "abuse of discretion." Specifically, Petitioner identifies the following alleged acts of judicial bias: (1) failing to declare a mistrial during jury selection due to biased and prejudiced statements that tainted prospective jurors; (2) failing to inform Petitioner of a letter the judge wrote to Petitioner's counsel after counsel failed to appear for a hearing; and (3) failing to declare a mistrial when Sergeant Morse falsely testified that Claire Nehring was a trained sexual assault counselor. Because Petitioner did not assert these claims in state court, such will be assessed de novo.

The Fourteenth Amendment to the United States Constitution guarantees to every criminal defendant the right to a "fair trial in a fair tribunal before a judge with no actual bias against the defendant." *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)). To prevail on his claim of judicial bias, Petitioner must demonstrate that the trial judge exhibited conduct "so extreme as to display clear inability to render fair judgment." *Lyell*, 470 F.3d at 1186-87 (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

As the Supreme Court has observed, however, "judicial rulings alone almost never

25

constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Furthermore, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* (emphasis added).

        None of the items cited by Petitioner come close to satisfying this standard. Petitioner has failed to identify, and the Court does not discern, any biased or prejudicial statements that could have tainted the pool of prospective jurors. As noted above, Petitioner has failed to establish that referring to Claire Nehring as a trained sexual assault counselor was inaccurate or misleading. The letter to which Petitioner refers was written by the trial judge after Petitioner's counsel failed to appear for Petitioner's arraignment. (PageID.963). Petitioner has presented no evidence that counsel failed to appear at any subsequent hearing or proceeding. Moreover, Petitioner has identified no authority supporting the proposition that the judge was somehow obligated to share this letter with Petitioner or that failure to do so constitutes judicial bias or otherwise deprived Petitioner of the right to a fair trial. Accordingly, this argument is rejected.

V.                    Ineffective Assistance of Trial Counsel

Petitioner asserts numerous allegations that his trial attorney rendered constitutionally ineffective assistance.  Many of Petitioner's ineffective assistance of counsel claims were presented in state court and are subject, therefore, to the deferential standard of review articulated above. Several other such claims were not asserted in state court and will, therefore, be reviewed de novo. As discussed below, none of Petitioner's claims have merit.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  In the context of a sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for

27

counsel's errors, he would have received a more favorable sentence.  *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

28

A.      Claims Asserted in State Court

Petitioner asserted in state court the following arguments in support of his position that he was denied the right to the effective assistance of counsel: (1) counsel failed to appear at a hearing; (2) counsel failed to request sequestration of the jury during voir dire; (3) counsel failed to object to biased and prejudicial statements made during voir dire; and (4) counsel failed to present evidence from witnesses.


1.      Failure to Appear at Hearing

Petitioner argues that he is entitled to relief because his attorney failed to appear at his originally scheduled arraignment.  (PageID.941-42).  On February 25, 2008, the trial judge authored a letter to Petitioner's counsel regarding his failure to appear for Petitioner's arraignment. (PageID.963).  The judge rescheduled Petitioner's arraignment and there is no evidence that counsel failed to appear for the rescheduled arraignment or any other hearing or proceeding.  Moreover, there is no evidence that Petitioner was in any way prejudiced because his arraignment was rescheduled.

The trial judge denied this claim on the ground that Petitioner had failed to demonstrate that he was prejudiced by the conduct in question.  (PageID.1041).  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

29

2.      Failure to Seek Sequestration

Petitioner argues that his trial attorney erred by failing to request that the members of the jury venire be sequestered during the voir dire process.  (PageID.943-46).  Petitioner's claim is premised on the fact that several jurors answered voir dire questions in a way that suggested they may not be able to serve impartially after which they were excused from service either for cause or via peremptory challenge.  None of the comments by any potential jurors were extraordinary or so inflammatory as to give rise to any reasonable concern that such influenced any other juror. Moreover, many potential jurors were questioned in chambers outside the presence of the other potential jurors.  Again, the jurors who served at Petitioner's trial agreed to follow the Court's instructions and Petitioner has identified nothing suggesting that such was not the case.  The trial judge denied this claim.  (PageID.1041).  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


3.      Failure to Object to Biased and Prejudicial Statements

Petitioner faults his attorney for failing to object to the allegedly biased and prejudicial statements made by potential jurors during the jury selection process.  It is not appropriate to "object" during the voir dire process to a statement made by a potential juror.  Rather, if an attorney believes a potential juror is unable to serve fairly and impartially, the appropriate response is to either question the juror further and/or seek their removal either for cause or through use of a peremptory challenge.  Petitioner has failed to identify any juror serving at his trial who

30

should have instead been removed for cause.  Moreover, as the trial judge noted, Petitioner did not

utilize all of his peremptory challenges.  Simply put, Plaintiff has failed to demonstrate that his

attorney rendered deficient performance during void dire or that such resulted in prejudice.  The trial

judge denied this claim.  (PageID.1041).  This decision is neither contrary to, nor involves an

unreasonable application of, clearly established federal law.  Furthermore, this decision was not

based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly,

this claim raises no issue upon which habeas relief may be granted.


4.       Failure to Present Evidence

Petitioner argues that his attorney improperly failed to: (1) present evidence from an

expert witness concerning forensic examinations of children and (2) present an alibi defense.

Petitioner has presented no evidence that the expert witness in question would have presented

testimony favorable to his position.  Likewise, Petitioner has presented no evidence suggesting that

he could have presented a viable alibi defense.  Thus, even assuming Petitioner could establish

deficient performance by his attorney, he cannot demonstrate that he was prejudiced thereby.  The

trial judge denied this claim.  (PageID.1041).  This decision is neither contrary to, nor involves an

unreasonable application of, clearly established federal law.  Furthermore, this decision was not

based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly,

this claim raises no issue upon which habeas relief may be granted.


B.       Claims Asserted for the First Time in this Court

Petitioner also asserts in this Court several claims of ineffective assistance which he

31

failed to present in state court.

First, Petitioner asserts that his attorney improperly failed to object to statements at trial falsely describing Claire Nehring as a trained sexual assault counselor.  (PageID.12, 33).  As previously discussed, Petitioner has failed to demonstrate that such statements were inaccurate.  Thus, Petitioner cannot establish that his attorney was deficient for failing to object to such or that counsel's failure resulted in prejudice.  Accordingly, this argument is rejected.

Petitioner next argues that "counsel failed to object to any of the numerous testimonial statements of others who were not in court or even subpoenaed." (PageID.33).  Beyond this single conclusory statement, Petitioner has failed to develop this argument.  Petitioner offers no indication of the "testimonial statements" to which he is referring and, likewise, fails to articulate how his attorney's alleged failure to object to such prejudiced his defense.  Accordingly, this argument is rejected.

Next, Petitioner argues that his attorney "failed to move for a taint hearing." (PageID.31).  Petitioner has failed to develop this argument.  Petitioner alleges that his attorney learned, during a July 2, 2008 hearing that "the alleged victims were most probably tainted by untrained, unlicensed authority figures for over a year." (PageID.31).  Petitioner has not identified the portion of the record supporting this assertion and the Court fails to discern such.  Petitioner has likewise failed to explain what a "taint hearing" is or how such a hearing would have advanced his position.   In sum, Petitioner has failed to satisfy either prong of the *Strickland* analysis.  Accordingly, this argument is rejected.

Finally, Petitioner faults his attorney for failing to move for dismissal of charges prior to trial.  (PageID.31).  Petitioner has presented no argument, however, describing the basis for any

such dismissal or the likelihood that any such request would have been granted.  Petitioner's unsupported conclusory statements simply fail to establish either prong of the *Strickland* analysis. Accordingly, this argument is rejected.

## VI.          Ineffective Assistance of Appellate Counsel

Petitioner asserts that he is entitled to relief because his appellate counsel: (1) failed to submit an affidavit of verity; (2) failed to pursue a claim regarding the comments, discussed above, by Juror Havens; and (3) failed to assert a claim of ineffective assistance of trial counsel based on counsel's failure to move for sequestration during the jury selection process.  (PageID.12, 39, 57).

As discussed above, Petitioner's jury sequestration claim as well as his claim regarding Juror Havens' comments are without merit.  Petitioner's "affidavit of verity" was intended to support this latter argument.  (PageID.45).  Because these claims lacked merit, appellate counsel cannot have been ineffective for failing to assert such.  Petitioner asserted these claims in his post-conviction motion for relief.  (PageID.954).  The trial judge's rejected of these claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Nor was this decision based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly,

the undersigned recommends that Clark's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  September 1, 2016

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge

34